IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **ARI SMELKINSON,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>**PEADEN, LLC,** a Delaware company,<br><br>*Defendant.* | **Case No.** 5:26-cv-00104-MW-MJF<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff Ari Smelkinson ("Plaintiff Smelkinson" or "Smelkinson") brings this Class Action Complaint and Demand for Jury Trial against Peaden, LLC, ("Defendant" or "Peaden") to stop the Defendant from violating the TCPA and Florida Telephone Solicitation Act ("FTSA") by placing calls and text messages to consumers without consent including pre-recorded voice calls and calls/text messages to phone numbers that are registered on the National Do Not Call registry ("DNC"), and unsolicited calls that are placed to consumers using an autodialer in violation of the FTSA. Plaintiff also seeks injunctive and monetary relief for all persons injured by Defendant's conduct. Plaintiff Smelkinson, for this Complaint, alleges as follows upon personal knowledge as to himself and his own acts and

1

experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## PARTIES

1. Plaintiff Smelkinson is a resident of Panama City Beach, Florida.

2. Defendant Peaden is a company registered in Delaware, with its headquarters located in Panama City, Florida. Defendant conducts business throughout Florida under the trade name "Peadon Air Conditioning, Plumbing & Electrical."

## JURISDICTION AND VENUE

3. This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA") as well as supplemental jurisdiction over Plaintiff's state law claims under the Florida Telephone Solicitation Act, Fla. Stat. § 501.059 ("FTSA").

4. This Court has personal jurisdiction and venue is proper since the Defendant has its headquarters in this District and the wrongful conduct giving rise to this case was directed from the Defendant into this District where the Plaintiff also resides.

**INTRODUCTION**

5.     As the Supreme Court explained at the end of its term, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (U.S. July 6, 2020).

6.     When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

7.     By 2003, due to more powerful autodialing technology, telemarketers were calling 104 million Americans every day. In re Rules and Regulations Implementing the TCPA of 1991, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

8.     The problems Congress identified when it enacted the TCPA have only grown exponentially in recent years.

9.     According to online robocall tracking service "YouMail," 4.1 billion robocalls were placed in December 2025 alone, at a rate of 132.6 million per day. www.robocallindex.com (last visited January 25, 2026).

10.     The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and

232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data.

11.    "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), statement of FCC chairman.[1]

12.    "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).[2]

## COMMON ALLEGATIONS

13.    Defendant Peaden provides HVAC, plumbing, and electrical services to consumers and businesses throughout Florida.[3]

14.    Defendant Peaden places calls to consumers to generate business.

15.    Defendant Peaden uses Hatch, an AI-based, automated consumer contact system that can fully interact with consumers through calls and text messages without human intervention.

---

[1] https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls

[2] https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf

[3] https://www.linkedin.com/company/peaden/about/

16. Hatch describes itself as an AI CSR platform that enables businesses to generate and manage one-to-one, revenue-driving conversations at scale with fully custom AI CSRs natively integrated with your lead sources and CRM.

17. Hatch's AI agents automatically initiate outreach without human involvement. Hatch states: "Your AI agents ensure every call is answered and every new lead is instantly reached out to, 24/7."[4]

18. Hatch's system automatically selects telephone numbers from a database and initiates contact. Hatch's website explains that users "Create triggers based on any CRM data point" for "[c]ustom targeting.[5]

19. Hatch's generative AI technology automatically sends messages without human initiation as the AI bots will text customers for companies and hold authentic conversations with prospective clients.

20. Defendant Peaden is a featured Hatch customer with a dedicated case study on Hatch's website. Peaden's Director of Marketing and Customer Experience, Tyler Cassavore, is quoted extensively about Peaden's use of Hatch.[6] According to Tyler Cassavore, "With Hatch, it is going to handle the text and email portion on all of them automatically on a preset cadence."[7] As stated on the Peaden page on the

---

[4] https://www.usehatchapp.com/
[5] *Id.*
[6] https://www.usehatchapp.com/testimonials/peaden
[7] https://www.usehatchapp.com/testimonials/peaden

Hatch website: "When contacts meet the trigger criteria for these campaigns, Hatch automatically reaches out to them over text and email, over a preset cadence, following up until the contact responds."[8]

21.    Defendant Peaden uses Hatch to screen consumers through an automated system that does not require any human intervention:

> When contacts meet the trigger criteria for these campaigns, Hatch automatically reaches out to them over text and email, over a preset cadence, following up until the contact responds. Then when the contact responds, an AI CSR is there to handle all of the initial interactions before handing off to a human rep. This results in significant time savings for the human CSRs and ISRs on staff.
>
> "Our Speed to Lead bot Josie grabs their name, address, what's going on, makes sure they're the homeowner, advises them of our dispatch fees, and confirms what day they prefer. And then if everything's good, she passes off to a CSR to book the appointment."        [9]

22.    Hatch also provides automated call technology, in addition to automated texting:

> **Omnichannel outreach**
> "I like that you can reach out to leads and customers with text, email, and phone all on the same day, and that you can do a drip campaign or preset cadence over time."        [10]

23.    In addition, Hatch enables its users, including Defendant Peaden, to send pre-recorded voicemail messages automatically to consumers. Hatch's website explains: "In addition to sending out text and email, in Hatch you can also send out pre-recorded voicemails in Campaigns. This allows you to leave a voicemail for your

---

[8] https://www.usehatchapp.com/testimonials/peaden
[9] Id.
[10] Id.

customer without calling them."[11] Hatch further states: "With voicemails in campaign, your team can send the prospect's cell phone a missed call notification and a pre-recorded voicemail message. This frees up your team's time from having to call customers one by one."[12]

24.    Unfortunately, Peaden is using Hatch to contact consumers without consent, including after the consumer has asked for the calls/texts to stop, as per Plaintiff's experience.

25.    In fact, a consumer posted the following on the Better Business Bureau page for Peaden:

> **👤 Initial Complaint**     **Type:** 🅰 Sales and Adver
>
> **Date:** 06/07/2024          **Status:** 💬 Answered
>
> Peaden Air conditioning wont stop texting me with advertisements for services, I have called them and asked them to stop countless times but they continue. I just want the harassment to stop [13]

26.    Based on the above, and based on Plaintiff's experience, Peaden is placing unsolicited calls and text messages to consumer phone numbers, including unsolicited pre-recorded calls.

27.    In response to these calls and text messages, Plaintiff Smelkinson brings forward this case seeking injunctive relief requiring the Defendant to cease

---

[11] https://www.usehatchapp.com/blog/voicemail-drop-in-hatch
[12] *Id.*
[13] https://www.bbb.org/us/fl/panama-city/profile/heating-and-air-conditioning/peaden-air-conditioning-plumbing-electrical-0683-11000795/complaints

from violating the TCPA and FTSA, as well as an award of statutory damages to the members of the Classes and costs.

### PLAINTIFF SMELKINSON'S ALLEGATIONS

28. Plaintiff Smelkinson is the subscriber and sole user of the cell phone number ending with 5221.

29. Plaintiff Smelkinson registered his cell phone number on the DNC on June 20, 2019.

30. Plaintiff Smelkinson uses his cell phone number for personal use only as one would use a landline telephone number in a home. Such use includes speaking to family and friends.

31. Plaintiff Smelkinson's cell phone number is not associated with a business and is not used for business-related purposes.

32. Plaintiff Smelkinson only has his cell phone number that he uses for residential use. He does not have a landline or VOIP phone number.

33. Plaintiff Smelkinson resides in Florida and his cell phone number has an 850 Florida area code.

34. In November of 2023, Plaintiff Smelkinson contacted Peaden by phone to get a quote to replace his home's HVAC.

35. After inspecting the home, Defendant Peadon called Plaintiff by phone to present him a quote for the work. Plaintiff felt that the quote was above his budget

8

and decided not to do business with Peaden. On that phone call, Plaintiff Smelkinson specifically instructed Peaden to not contact him again. Any established business relationship was terminated on the day of this call.

36. Despite Plaintiff Smelkinson's request, Defendant Peaden continued calling and sent unsolicited text messages to Plaintiff's cell phone throughout 2024 and 2025.

37. The calls and text messages were soliciting Peaden's HVAC, plumbing and electrical services.

38. For example, on May 21, 2025, Plaintiff Smelkinson received an unsolicited call to his cell phone from 850-872-1004.

39. This call was not answered, but a pre-recorded voicemail was left soliciting Peaden's HVAC services.

40. The pre-recorded voicemail specifically stated that it was left by Peaden.

41. Plaintiff Smelkinson could tell that the voicemail sounded pre-recorded because of the unnatural intonation, robotic and scripted sound of the dialogue.

42. According to the Valparaiso Chamber of Commerce, 850-872-1004 is the phone number for Peaden:

9



Air Conditioning/Heating, Plumbers

⊙ 13 Memorial Parkkway Northwest, Fort Walton Beach, FL 32548

𝒥 (850) 872-1004                                        14

43.    Plaintiff Smelkinson called 850-872-1004 back on May 21, 2025.

44.    Plaintiff spoke to what sounded like a live agent and he instructed Peaden to stop calling and texting his cell phone number.

45.    Despite the stop requests Plaintiff had already made, he received a text message to his cell phone from 850-616-2204 on December 12, 2025 at 12:04 PM:



46.    The text message states that it was sent by Defendant Peaden.

---

[14] https://business.nicevillechamber.com/list/member/peaden-air-conditioning-plumbing-electrical-generators-2600

47.     Plaintiff Smelkinson texted 850-616-2204 back on December 12, 2025 at 12:41 PM, stating that he already told Peaden to take his cell number off its call/text list and warning about filing a TCPA complaint:



48.     On December 29, 2025, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204 at 3:02 PM:



49.     On December 30, 2025 at 9:03 AM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



50.    Plaintiff Smelkinson received an additional text message to his cell phone on December 31, 2025 at 11:31 AM from 850-616-2204 soliciting a whole-home duct inspection.

51.    Peaden advertises a "free whole-home duct inspection" but the inspection is done to solicit services that may be required by the consumer, such as fixing a leaky air duct, as well as to solicit air duct sealing services:

## Air Duct Testing

Leaky air ducts can result in the escape of 30% of the air moving through your HVAC system, leading to substantial energy and comfort losses. Ducts are prone to damage or leaks, and professional duct testing is essential to identify the extent of the problem and the necessary actions. Our duct testing service is the starting point to address your ductwork issues.

## Air Duct Sealing

Upon identifying duct leaks in your ventilation system, our Peaden Pros utilize cutting-edge technology to seal the leaks, ensuring everything becomes airtight once again. At Peaden Air Conditioning, Plumbing & Electrical, we always ensure a thorough and effective job right from the start. [15]

52.     On March 5, 2026 at 10:06 AM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



---

[15] https://www.peaden.com/panama-city/air-conditioning/duct-services

53.   On March 6, 2026 at 11:46 AM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



54.   On March 25, 2026 at 10:36 AM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



55.    On March 25, 2026 at 5:31 PM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



56.    On March 25, 2026 at 5:47 PM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



57.    On March 26, 2026 at 1:03 PM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:

15



58.    On March 30, 2026 at 9:33 AM, Plaintiff Smelkinson received another unsolicited text message to his cell phone from 850-616-2204:



59.    Plaintiff Smelkinson terminated his business relationship with Peaden in 2023.

16

60.    In addition, Plaintiff Smelkinson asked Peaden to stop calling/texting his cell phone, but the calls/text continued, as was shown above.

61.    The unauthorized solicitation telephone calls and text messages that Plaintiff Smelkinson received from or on behalf of Defendant Peaden have harmed Plaintiff in the form of annoyance, nuisance, and invasion of privacy, occupied his phone line, and disturbed the use and enjoyment of his phone.

62.    Seeking redress for these injuries, Plaintiff Smelkinson, on behalf of himself and Classes of similarly situated individuals, brings suit under the TCPA and FTSA.

## CLASS ALLEGATIONS

63.    Plaintiff Smelkinson brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and seeks certification of the following Classes:

> **Pre-recorded No Consent Class:** All persons in the United States who from four years prior to the filing of this action through class certification (1) the Defendant called on their cellular telephone number without their prior express written consent (2) using a pre-recorded voice.
>
> **Florida DNC Class**: All persons in Florida who from four years prior to the filing of this action through class certification (1) whose telephone numbers appear on the then-current "no sales solicitation calls" list, and (2) who received unwanted telephonic sales calls from or on behalf of the Defendant.
>
> **Florida IDNC Class:** All persons in Florida, who from four years prior to the filing of this action through class certification (1) whose telephone numbers appear on the then-current "no sales solicitation calls" list, and

17

(2) who received one or more voice calls and/or text messages more than 15 days after a request not to be contacted.

**Florida Autodial Class**: All persons in Florida who from four years prior to the filing of this action through class certification (1) who received unwanted telephonic sales calls from or on behalf of the Defendant (2) using the same equipment or type of equipment utilized to call the Plaintiff.

64.    The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which either Defendant or their parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against the Defendant have been fully and finally adjudicated and/or released. Plaintiff Smelkinson anticipates the need to amend the Class definitions following appropriate discovery.

65.    **Numerosity and Typicality**: On information and belief, there are hundreds, if not thousands of members of the Classes such that joinder of all members is impracticable, and Plaintiff is a member of the Classes.

66.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of the Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes.

Common questions for the Classes include, but are not necessarily limited to the following:

(a)     Whether Defendant's conduct violated the TCPA;

(b)     Whether Defendant placed unsolicited pre-recorded calls to Plaintiff and members of the Pre-Recorded No Consent Class without first obtaining consent to make the calls;

(c)     Whether Defendant placed calls to the Plaintiff and members of the Autodial class without first obtaining consent to make the calls;

(d)     Whether Defendant engaged in telemarketing without implementing adequate internal policies and procedures for maintaining an internal do not call list;

(e)     Whether the calls constitute a violation of the TCPA and FTSA:

(f)     Whether members of the Classes are entitled to treble damages based on the willfulness of Defendant's conduct.

67.     **Adequate Representation**: Plaintiff Smelkinson will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in class actions. Plaintiff Smelkinson has no interests antagonistic to those of the Classes, and the Defendant has no defenses unique to Plaintiff. Plaintiff Smelkinson and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiff Smelkinson nor his counsel have any interest adverse to the Classes.

19

68.    **Appropriateness**: This class action is also appropriate for certification because the Defendant has acted or refused to act on grounds generally applicable to the Classes and as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Classes uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Classes as wholes, not on facts or law applicable only to Plaintiff Smelkinson. Additionally, the damages suffered by individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Classes to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Smelkinson and the Pre-Recorded No Consent Class)**

69.    Plaintiff Smelkinson repeats and realleges the prior paragraphs of this Complaint and incorporates them by reference herein.

70.    The Defendant transmitted unwanted telephone calls to Plaintiff Smelkinson and the other members of the Pre-recorded No Consent Class using a pre-recorded voice message.

71.    These pre-recorded voice calls were made *en masse* without the prior express written consent of the Plaintiff and the other members of the Pre-recorded No Consent Class.

72.    The Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(B). As a result of Defendant's conduct, Plaintiff and the other members of the Pre-recorded No Consent Class are each entitled to a minimum of $500 in damages, and up to $1,500 in damages, for each violation.

## SECOND CLAIM FOR RELIEF
**Florida Telephone Solicitation Act**
**(Violation of the Fla. Stat. § 501.059)**
**(On Behalf of Plaintiff Smelkinson and the Florida DNC Class)**

73.    Plaintiff repeats and realleges paragraphs 1-68 of this Complaint and incorporates them by reference herein.

74.    Plaintiff Smelkinson brings this claim individually and on behalf of the Florida DNC Class Members against the Defendant.

75.    It is a violation of the FTSA to "make or cause to be made any unsolicited telephonic sales call to any residential, mobile, or telephonic paging device telephone number if the number for that telephone appears in the then-current

21

quarterly listing published by the department." Fla. Stat. § 501.059(4).

76.    A "telephonic sales call" is defined as a "telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(1)(i).

77.    In violation of the FTSA, Defendant made and/or caused to be made unsolicited telephone sales calls to Plaintiff Smelkinson and other members of the Florida DNC Class, despite their telephone number appearing on the quarterly listing published by the Department.

78.    As a result of Defendant's conduct, and pursuant to § 501.059(10)(a) of the FTSA, Plaintiff Smelkinson and Class members were harmed and are each entitled to a minimum of $500.00 in damage for each violation. Plaintiff Smelkinson and the Class members are also entitled to an injunction against future calls. *Id.*

**THIRD CLAIM FOR RELIEF**
**Florida Telephone Solicitation Act**
**(Violation of the Fla. Stat. § 501.059)**
**(On Behalf of Plaintiff Smelkinson and the Florida IDNC Class)**

79.    Plaintiff repeats and realleges paragraphs 1-68 of this Complaint and incorporates them by reference herein.

80.     Plaintiff Smelkinson brings this claim individually and on behalf of the Florida IDNC Class Members against the Defendant.

81.     The Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059, regulates telephonic sales calls made to consumers in the State of Florida.

82.     Under the FTSA, a telephone solicitor or other person may not initiate an outbound telephone call, text message, or voicemail transmission to a consumer who has previously communicated that he or she does not wish to receive such communications. Fla. Stat. § 501.059(5).

83.     Additionally, before the commencement of any action for damages under the FTSA for text message solicitations, the called party must notify the telephone solicitor that the called party does not wish to receive text messages. Within 15 days after receipt of such notice, the telephone solicitor shall cease sending text message solicitations to the called party and may not send text messages to the called party thereafter. Fla. Stat. § 501.059(10)(c).

84.     Text messages constitute telephonic sales calls under the FTSA. Fla. Stat. § 501.059(1)(j).

85.     Plaintiff and the members of the Florida IDNC Class requested that Defendant cease making telephonic sales calls to them.

86.     Despite receiving such "STOP" requests, Defendant continued to send telephonic sales calls in the form of text messages to Plaintiff and members of the

Florida IDNC Class more than 15 days after receiving their requests to cease, in violation of Fla. Stat. §§ 501.059(5) and 501.059(10)(c).

87.    Defendant's violations were willful and knowing in that Defendant knew or should have known that Plaintiff and members of the Florida IDNC Class had requested that Defendant stop sending text messages, yet Defendant continued to send text messages in disregard of those requests.

88.    As a result of Defendant's violations of the FTSA, Plaintiff and members of the Florida IDNC Class are entitled to $500.00 in damages for each such violation pursuant to Fla. Stat. § 501.059(10)(a).

89.    Because Defendant's violations were willful and knowing, Plaintiff and members of the Florida IDNC Class are entitled to treble damages of up to $1,500.00 for each such violation pursuant to Fla. Stat. § 501.059(10)(b).

90.    Plaintiff and members of the Florida IDNC Class are further entitled to injunctive relief to prevent Defendant from continuing to engage in the unlawful practices described herein, pursuant to Fla. Stat. § 501.059(10)(a)(1).

91.    Plaintiff and members of the Florida IDNC Class are entitled to recover their reasonable attorney's fees and costs from Defendant pursuant to Fla. Stat. § 501.059(11).

24

## FOURTH CLAIM FOR RELIEF
### Florida Telephone Solicitation Act
### (Violation of the Fla. Stat. § 501.059)
### (On Behalf of Plaintiff Smelkinson and the Florida Autodial Class)

92.     Plaintiff repeats and realleges paragraphs 1-68 of this Complaint and incorporates them by reference herein.

93.     Plaintiff Smelkinson brings this claim individually and on behalf of the Autodial Class Members against the Defendant.

94.     It is a violation of the FTSA to "make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection and dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

95.     A "telephonic sales call" is defined as a "telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(1)(i).

96.     Defendant failed to secure prior express written consent from Plaintiff Smelkinson and members of the Autodial Class.

97.     In violation of the FTSA, Defendant made and/or knowingly allowed telephonic sales calls to be made to the Plaintiff and the Autodial Class members without Plaintiff's and the Class members' prior express written consent.

98.     Defendant made and/or knowingly allowed the telephonic sales calls to Plaintiff Smelkinson and the Class members to be made utilizing an automated system for the selection and dialing of telephone numbers.

99.     As a result of Defendant's conduct, and pursuant to § 501.059(10)(a) of the FTSA, Plaintiff Ari Smelkinson and Class members were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiff Smelkinson and the Class members are also entitled to an injunction against future calls. *Id.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

a)  An order certifying this case as a class action on behalf of the Classes as defined above; appointing Plaintiff as the representative of the Classes; and appointing his attorneys as Class Counsel;

b)  An award of money damages and costs;

c)  An order declaring that Defendant's actions, as set out above, violate the TCPA and FTSA;

26

d)  An injunction requiring Defendant to cease all unsolicited calling activity, and to otherwise protect the interests of the Classes; and

e)  Such further and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Smelkinson requests a jury trial.

Respectfully Submitted,

**ARI SMELKINSON**, individually and on behalf of all others similarly situated,

DATED this 13th day of May, 2026.

By: /s/ *Stefan Coleman*

Stefan Coleman (Fla. Bar No. 30188)
COLEMAN PLLC
18117 Biscayne Blvd
Suite 4152
Miami, FL 33160
(877) 333-9427
law@stefancoleman.com

Avi R. Kaufman (Fla. Bar No. 84382)
kaufman@kaufmanpa.com
KAUFMAN P.A.
237 S Dixie Hwy, Floor 4
Coral Gables, FL 33133
Telephone: (305) 469-5881

*Attorneys for Plaintiff and the putative Classes*

27